UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

STEVEN CONGEMI,

                    Plaintiff,

          - against -

SACHEM SCHOOL DISTRICT,

                Defendant.

-------------------------------------------------------------- X

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ JAN 1 9 2016 ★

BROOKLYN OFFICE

**MEMORANDUM & ORDER**

2:11-cv-01561(AMD)(SIL)

**ANN DONNELLY,** District Judge.

The plaintiff, Steven Congemi,[1] brought this action against defendant Sachem School District on March 30, 2011, alleging that he is entitled to money damages under the Rehabilitation Act and Americans with Disabilities Act ("ADA") due to the district's failure to provide him with a free appropriate public education. Currently before me is the defendant's motion for summary judgment. For the reasons stated below, the defendant's motion for summary judgment is granted in its entirety.

## BACKGROUND

The plaintiff, a former student at the Sachem School District, was diagnosed with Tourette's Syndrome, attention-deficit/hyperactivity disorder, and obsessive compulsive disorder

---

[1] The plaintiff's mother, Elizabeth Rekowicz, initially filed a complaint on behalf of her son Steven Congemi. On July 15, 2015, the parties filed a stipulation of discontinuance as to Elizabeth Rekowicz, so that Steven Congemi is the only remaining plaintiff in this case. (ECF 68.)

in 2005, when he was in the eighth grade. (Declaration in Support of Defendant Sachem's Motion for Summary Judgment ("Def. Ex.") G, at 172-76.)[2] Once he reached high school, he was also diagnosed with anxiety. (*Id*., at 183; *see also* Def. Ex. M, at 3.) After conducting evaluations and convening a Committee on Special Education ("CSE"),[3] the school district concluded that the plaintiff had a disability that had an impact on his education.

In 2005 to 2006, when the plaintiff was in ninth grade, he was placed in a general education setting at Sachem North High School with home teaching in English and math. (Defendant's Statement of Fact Pursuant to Local Rule 56.1 ("Def. 56.1") ¶ 45, n. 3). In his tenth grade year, he was placed in a 15:1 special class at Sachem, again with home teaching in English and mathematics. (*Id*.) On April 20, 2007, a school psychologist, Nina Parlanti, evaluated the plaintiff. (Def. Ex. L.) She reviewed the results of his Wechsler intelligence tests, and noted that his overall cognitive functioning was in the average to low average range. (*Id*., at 2.) As he had difficulty processing information quickly, she recommended that he continue to take extended time on tests. (*Id*., at 4.) She also noted that he had difficulty maintaining focus and attention in the classroom; she believed that that his efforts to suppress his Tourette's-related tics could have a negative effect on his academic performance. (*Id*.) Ms. Parlanti asked the plaintiff's CSE to decide which level of support would be appropriate for him. (*Id*.)

---

[2] The facts set forth here are undisputed unless otherwise noted.

[3] New York has assigned responsibility for developing Individualized Education Plans to local Committees on Special Education, which are comprised of members appointed by the local board of education, the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others. *R.E. v. New York City Dept. of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012) (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)). These Individualized Education Plans are "the centerpiece" of the Individuals with Disabilities Education Act's requirement that school districts provide a "free appropriate public education ["FAPE"] . . . to all children with disabilities residing in the State." *Honig v. Doe*, 484 U.S. 305, 311 (1998); 20 U.S.C. § 1412(a)(1)(A).

In April of 2007, a CSE convened to create an individualized education plan for the plaintiff's 2007-2008, or eleventh grade, school year. (Def. Ex. M.)  They recommended that the plaintiff have minimal visual and auditory distractions, an abbreviated day, the opportunity to leave the classroom, a supervised setting for when he left the classroom, an informed teaching staff with insight into his tics, teacher reinforcement, and organizational strategies. (*Id.*, at 3-4.) The committee also recommended that he be placed in a special class with a 15:1 student-teacher ratio. (*Id.*, at 4.)

It is undisputed that during his ninth through eleventh grade school years at Sachem North High School, the plaintiff was permitted to leave the classroom whenever he had difficulty suppressing his tics. (Declaration of Kyle T. Pulis ("Pl. Ex."), Ex. A, at 61, 344; Pl. Ex. B, at 35-40, 95-97; Pl. Ex. C, at 70, 72, 81, 84).  In reports prepared for the plaintiff's CSE, several of his teachers expressed concern about his leaving the classroom.  For example, his social studies teacher was concerned that his frequent absences—he left class early 2-3 times a week—would affect his ability to pass the global history Regents' exam. (Pl. Ex. H.)  His ninth grade science teacher wrote that he "rushes through his assignments (including tests and quizzes), which affects the accuracy of his answers.  It seems that he does this so he can ask to leave the room to go to wherever he goes when he leaves class." (*Id.*)  His tenth grade earth science teacher similarly explained that while the plaintiff would succeed while he was in class, he had left class early on numerous occasions. (*Id.*)  Ultimately, however, the plaintiff received passing grades for his ninth and tenth grade coursework.  (Plaintiff's Counterstatement to Defendants' Local

Civil Rule 56.1 Statement and Plaintiff's Statement of Additional Facts Pursuant to Rule 56.1(b) ("Pl. 56.1") ¶¶ 132, 141.)[4]

In September of 2007, when the plaintiff was in eleventh grade, his treating psychiatrist, Dr. Ruth Bruun, submitted a letter to the district stating that the plaintiff was having difficulty controlling his tics. (Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10; Def. Ex. N.) She concluded that it was too hard for the plaintiff to participate in a full day of school, and recommended that his school day be shortened and that he study math at home with a tutor. (Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10; Def. Ex. N.) The school implemented this recommendation. (Def. Ex. O.) Only a month later, on October 3, 2007, Dr. Bruun sent another letter to the district; this time, she opined that the plaintiff's part-time attendance at school with home tutoring in math was proving too stressful for him. (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11; Def. Ex. O.) She explained that she was in the process of changing his medication, and recommended that he also be allowed to take English at home with a tutor, and that he attend only second through fifth periods of school. (Def. Ex. O.)

The district again implemented this recommendation. (Def. Ex. P.) Nevertheless, Dr. Bruun submitted yet another letter on October 29, explaining that "[d]espite an amended schedule and other accommodations," the plaintiff had "continued to struggle with tics and anxiety which is so severe that he has been unable to attend school over the past two to three weeks." (Def. 56.1 ¶ 12; Pl. 56.1 ¶ 12; Def. Ex. P.) Dr. Bruun recommended that the plaintiff be

---

[4] While the plaintiff admits that he received passing grades, he asserts that his grades "were not an accurate representation of the grades that he had earned and were bolstered by the District." ("Pl. 56.1" ¶ 148-50, 157.) First, the plaintiff claims that his test scores must have been bolstered because he was "rarely in class." (Pl. Ex. A, at 111.) In addition, he claims that one of his history teachers, Ms. Morano, only graded him on the test questions that he answered. (Pl. 56.1 ¶¶ 150-154, Pl. Ex. A, at 107-109). For example, if a test consisted of fifty questions, and the plaintiff only answered ten, his grade would be based only on those ten questions that he was able to answer. (*Id.*, at 109.)

placed on a full home tutoring schedule until his condition had improved.  (Def. 56.1 ¶ 12; Pl. 56.1 ¶ 12; Def. Ex. P.)  She explained that she was making changes to his medications, and did not expect that he could return to school for six to eight weeks.  (Def. 56.1 ¶ 12; Pl. 56.1 ¶ 12; Def. Ex. P.)

Sometime in November of 2007, the plaintiff's educational advocate, Pat Guerin, recommended that the Education Assistance Corporation ("EAC") might be appropriate for the plaintiff.  (Def. Ex. G, at 244-248.)  EAC's stated purpose was to "help junior and senior high school[] students who cannot function in a regular school environment obtain the necessary education which will make it possible for them to graduate from high school."  (Def. Ex. S.)  In response to a request from the plaintiff's mother, a CSE subcommittee met on November 7, 2007 to consider this potential placement.  (Def. 56.1 ¶¶ 19, 46; Pl. 56.1 ¶¶ 19, 46.)  At this meeting, the plaintiff's mother requested that the plaintiff be placed at EAC.  (Def. 56.1 ¶ 46; Pl. 56.1 ¶ 46; Def. Ex. F, at 129; Def. Ex. G, at 254; Def. Ex. T ("Mrs. Rekowicz definitely wants EAC for Steven.").)[5]  Another CSE meeting was scheduled for November 26, 2007, as the subcommittee was not authorized to approve a placement more restrictive than the one the plaintiff was currently in.  (Def. 56.1 ¶ 46; Pl. 56.1 ¶ 46.)

On November 15, 2007, before the full CSE committee meeting, Dr. Bruun submitted an evaluation of the plaintiff.  (Def. Ex. Q.)  She stated that she had been treating him since March 2005 for Tourette's syndrome, and that during that time, he had been placed on seven different medications but had not significantly improved.  (*Id.*)  She explained that efforts by his school to shorten his day and fill in the gaps with home tutoring had been unsuccessful, and that home

---

[5] With respect to the placement at EAC, the plaintiff's mother was represented by an attorney, Doreen Cordova.  (Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19.)

tutoring would not allow him to socialize. (*Id.*)  Ultimately, she concluded that the plaintiff required a school setting that provided "as much one-to-one teaching as possible as well as a quiet milieu and the flexibility to move about and to leave a classroom when he becomes overwhelmed.  Without these special accommodations, [the plaintiff] will surely fail in school." (*Id.*)  In an addendum to this letter, Dr. Bruun added that the plaintiff was "easily overwhelmed by the noise and activity levels that are a natural part of a regular high school and requires the more peaceful environment that a small school setting would provide."  (Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14; Def. Ex. Q.)

The plaintiff's mother, uncle, and advocate, Marcia Vogel, all attended the November 26, 2007 CSE meeting on his behalf.  (Def. Ex. X, at 1.)  At this meeting, Ms. Vogel specifically requested that the CSE find that Sachem North was not appropriate for the plaintiff, and that he be placed at EAC instead.  *See id.*, at 12 ("[W]e would like to have the CSE make an application to the EAC.  It has [a] small environment.  It has more 1:1 instruction.  It has the ability for him to be able to go let out his tics come back and be educated but it's not in isolation as it is in [his] home."); *see also id.*, at 26 ("On behalf of the family I'd like to make a formal request that the CSE recognize that Sachem North is not the appropriate building.  Not the appropriate educational . . . situation for him and that application be made to EAC.").  The plaintiff's mother echoed this request.  *See id.*, at 53 ("So that's why we're suggesting EAC.  If we're going to work with him 1:1 let's give it a chance.").  The school's special education assistant coordinator, Susan Tuttle, explained that she would seek more information about the EAC program and inquire about its availability, but that her recommendation was that the plaintiff be placed in a 15:1 classroom with support from a social worker.  (*Id.*, at 47-48.)

In the meantime, the plaintiff's CSE team placed him on full time home instruction. (Pl. 56.1 ¶ 160; Def. Ex. X at 54.) The parties do not dispute that the plaintiff did not receive all of the required home instruction during this time; indeed, the defendant concedes that the plaintiff received "little, if any" home instruction. (Def. 56.1 ¶ 49; Pl. 56.1 ¶ 49.) The defendant attributes this failure to the plaintiff's mother and stepfather; according to the defendant, assistant school principal Kenneth Costa gave the plaintiff's mother's contact information for tutors, but she did not call them back when they tried to schedule instruction. (Def. 56.1 ¶ 49; Ex. FF at 763-64; Ex. RR.) The plaintiff's step-father referred the tutors to the plaintiff's mother when they called. (Def. 56.1 ¶ 49; Ex. FF at 764.) The plaintiff generally disputes this account, but does not point to any evidence contradicting it. (Pl. 56.1 ¶ 49.) The plaintiff remained on full time home instruction for about three months.

In February of 2008, the district transferred the plaintiff to EAC, which he attended until June of 2010. (Pl. 56.1 ¶ 22; Pl. Ex. A, at 42.) There were about 40 students at EAC, which the plaintiff describes as a "private tutorial program." (Def. 56.1 ¶ 109, Pl. 56.1 ¶¶ 183-84.) The plaintiff attended EAC for three hours a day, five days a week, and his schedule included English, U.S. history, geometry, computer, and physical education classes. (Def. 56.1 ¶ 50; Pl. 56.1 ¶ 50; Def. Ex. Y, at 4-5.) While the plaintiff mostly received one-on-one teaching at EAC, he attended physical education classes with other students. (Def. Ex. Y, at 5; Def. Ex. W, at 4.)

At the CSE meeting for the plaintiff's 2008-2009 school year, the plaintiff's mother stated that he was "very fond [of] and . . . talks highly of all of his teachers." (Def. Ex. Y, at 6; *see also id.*, at 12 ("[H]e's communicated to me he's happy, he can't say enough."). The director of EAC, who also attended the meeting, explained that the plaintiff "seem[ed] to be happy" at the program, and that "he interacts with other students when he's in the gym . . . [H]e seems to get

along well with all of his teachers.  Whenever he's here he seems to be very happy."  (Def. Ex. Y, at 5.)  The CSE team confirmed the plaintiff's placement at EAC, and then approved his continued placement at EAC for the 2008-2009 school year.  (Def. 56.1 ¶ 50; Pl. 56.1 ¶ 50; Def. Ex. W, at 8; Def. Ex. V.)  The plaintiff's 2008-2009 IEP provided that he was to receive teaching at EAC for three hours each day, five days per week, along with a forty-minute counseling session once a week and regular physical education.  (Pl. 56.1 ¶ 51; Def. Ex. W.)  It indicated that the CSE team considered other less restrictive placements for the plaintiff, including a 15:1 special class and private school, but that none were found to be suitable for his needs.  (Def. Ex. W, at "Least Restrictive Environment Statement.").

The parties dispute the success of the plaintiff's time at EAC.  At the hearing before the IHO, the plaintiff testified that he felt more comfortable with the one-on-one teaching environment at EAC, and with the pace of the teaching there.  (Def. Ex. FF, at 941-42, 948.)  For example, the plaintiff stated that through his time at EAC, he better understood the modern translation of Shakespeare plays, and that he learned strategies such as using flash cards and summarizing information.  (*Id.*, at 943-45.)  His English teacher at EAC testified that the plaintiff was an "excellent" student who earned grades in the 80s and 90s, and whose anxiety did not impede his progress during the 2008-2009 school year.  (Def. 56.1 ¶¶ 98-99; Def. Ex. FF, at 345-47.)  Similarly, the plaintiff's U.S. history and government teacher testified that he did grade level work, and that she did not believe that his disability was impeding his education at EAC. (Def. 56.1 ¶ 100.)

In this court, however, the plaintiff asserts that while he was at EAC, he continued to suffer from the same issues he had at Sachem.  (Pl. 56.1 ¶ 189.)  Specifically, he claims that his EAC teachers "guid[ed] . . . and walk[ed]" him through tests, and that he was unable to stay in

classes. (*Id.*, Pl. 56.1 ¶ 189, Pl. Ex. A at 115, 195, 281-82; Pl. Ex. B, at 129-30.) The plaintiff's mother informed the Sachem School District of her concerns, but claims that they were indifferent to them. (Pl. 56.1 ¶ 198.)

The plaintiff passed the New York State Regents exams in June of 2009 and graduated with a local high school diploma in June 2010.[6] (Def. Ex. BB.) He was accepted to Landmark College upon his high school graduation. (Def. Ex. FF, at 991, 1007.)

### Administrative Proceedings

In an October 30, 2009 due process complaint, the plaintiff's mother alleged that the plaintiff had been denied a free appropriate public education under the Individuals with Disabilities in Education Act ("IDEA") for the 2007-2008 and 2008-2009 school years, and sought compensatory education[7] and legal fees. (Pl. Ex. F.) An impartial hearing officer ("IHO") held hearings, with both in-person and telephonic testimony from witnesses, from February through April 2010. (*Id.*, at 1.) In an October 1, 2010 decision, the IHO noted that the plaintiff's "disorders, in their totality, required the constant every day support of his mother and relatives, the on-going consultations with Dr.Bruun, his psychiatrist . . . his therapists--social workers, and the educational program provided for him by the School District. (*Id.*, at 7-8.) As a result of their support, the IHO found, the "[s]tudent attained passing grades, obtained his New York State driver's license, engaged in sport activities, played drums with friends, was able to hold a part-time job for some months, and was accepted by Landmark college." (*Id.*, at 8.)

---

[6] The plaintiff graduated a year late at his mother's request, because she felt that he was not prepared to graduate in 2009. (Def. Ex. FF, at 186-88.)

[7] The IHO explained that compensatory education "may be awarded as an equitable relief when there is a finding that a student did not receive a FAPE, and some form of relief is necessary for the student to receive educational services that the School District should have provided such student initially." (*Id.*, at 9-10.)

As an initial matter, the IHO found that the plaintiff's claims about the 2007-2008 school year were time-barred by the two-year statute of limitations applicable to claims brought under the IDEA, and that he therefore could only consider any claims arising out of the 2008-2009 school year. (*Id.*, at 9-10.) With respect to that school year, the plaintiff received 1:1 instruction at EAC, where the IHO found that he had received educational benefits. (*Id.*, at 10.) The IHO noted that the plaintiff had stated that he was more comfortable with the pace of teaching at EAC, that he had received A and B grades in his classes that year, that his tics were reduced while he was there, and that he had been accepted to college. (*Id.*, at 10.) He found, however, that the school district had failed the student with respect to his home tutoring, and that he therefore was in need of remediation in reading and writing. (*Id.*, at 11.)

The IHO therefore concluded that the plaintiff's mother had not shown that he had been denied a free appropriate education in the 2008-2009 school year. (*Id.*, at 11.) He noted that the plaintiff had passing grades at Sachem and at the EAC, and that the plaintiff's testimony at the hearing "revealed a young man who has made progress" and "received meaningful educational benefits through his IEPs." (*Id.*, at 11.) The IHO explained that he would normally make a compensatory award as to reading and writing remediation, but that there were no facts in the record as to the extent of the required remediation or its costs. (*Id.*, at 11-12.) He therefore denied the claim for compensatory education and legal fees. (*Id.*, at 12.)

The plaintiff's mother appealed this decision to a State Review Officer ("SRO"). (Pl. Ex. G.) The SRO noted that in the Second Circuit, compensatory damages are only available once a student is no longer eligible to receive IDEA services, due to age or graduation, if there was a gross violation of the IDEA resulting in the denial of educational services for a substantial period of time. (*Id.*, at 3-4 (citing *Sozoma v. New York City Dep't of Educ.*, 538 F.3d 106, 109 (2d Cir.

2008)).  Moreover, since "graduation and receipt of a high school diploma are generally considered to be evidence of educational benefit . . . it would appear that it would be the rare case where a student graduates with a Regents or local high school diploma and yet still qualifies for an award of compensatory education."  (*Id.*, at 4 (internal citations omitted)).

Based on his review of the hearing record, the SRO found that the plaintiff's case "does not present that rare case wherein a student has graduated, received a local diploma, and remains eligible for compensatory education."  (*Id.*, at 5.)  Rather, the weight of the evidence in the record showed that the district "was responsive to the parent's various requests regarding the student's educational needs over time, and made changes to the student's IEP as his educational needs evolved."  (*Id.*, at 11.)  He also noted that the hearing record showed that the plaintiff had earned academic credits, graduated with a local diploma, and had been accepted to college.  (*Id.*)  He therefore found that the district had satisfied its burden to show that there had been no gross violation of the IDEA, and that the plaintiff was no longer eligible for special education services due to his graduation.  (*Id.*)  For these reasons, on December 30, 2010, the SRO affirmed the IHO's decision denying the parent's request for compensatory education services, except to the extent that it had found that the student would have been eligible for compensatory education to address his reading and writing skills, had the parents submitted evidence of the extent and cost of that remediation.  (*Id.*, at 12.)

The plaintiff's mother initiated another impartial hearing in August 2011, claiming that her son had been denied a free appropriate public education for the 2009-2010 school year. Impartial Hearing Officer Joel D. Ziev dismissed this claim on November 3, 2011, finding that the IHO's October 1, 2010 and SRO's December 30, 2010 decisions resolved her claims about the plaintiff's 2009-2010 school year.  (Def. Ex. OO.)  The plaintiff's mother appealed this

decision to an SRO, who ruled that she was barred from re-litigating her concerns regarding the 2009-2010 school year by the principle of *res judicata*.  (*Id.*, at 3-5.)  The SRO further found that even if her claims were not barred, she had not shown a gross violation of the IDEA such that compensatory educational services would be warranted.  (*Id.*, at 6.)

## PROCEDURAL HISTORY

After initially proceeding *pro se* in this action, the plaintiff obtained counsel and filed an amended complaint on November 5, 2012.  (ECF 33.)  In his amended complaint, he seeks compensatory, emotional and punitive damages under the ADA and Rehabilitation Act due to the district's alleged violation of his rights under the IDEA.

The defendant moved to dismiss the amended complaint shortly after it was filed, and on September 10, 2013, the Honorable Joanna Seybert ruled on the defendant's motion.  *Rekowicz v. Sachem School Dist.*, No. 11-cv-1561, 2013 WL 4852305 (E.D.N.Y. Sept. 10, 2013).  First, Judge Seybert dismissed any claims under the IDEA, to the extent the plaintiff intended to raise them, as monetary damages are not available under that statute.  *Id.*, at *5.  Next, Judge Seybert found that the plaintiff's allegation that the district had manipulated his test scores to accelerate his progress through school was sufficient to support his claims under the ADA and Rehabilitation Act.  *Id.*  Finally, Judge Seybert addressed the defendant's argument that the plaintiff's ADA and Rehabilitation Act claims were barred by the three-year statute of limitations.  *Id.*, at *6.  Judge Seybert found that because the plaintiff had commenced his action on March 30, 2011, his claims "regarding the 2009-2010 school year are clearly within the three year statute of limitations."  *Id.*  With respect to the plaintiff's claims arising out of earlier school years, Judge Seybert found that the statute of limitations was equitably tolled during the time that the plaintiff was required to pursue administrative remedies.  *Id.*, at *7.  Therefore, she found

that claims relating to the plaintiff's 2007-2008 and 2008-2009 school years were not barred by the statute of limitations. *Id.*, at *6-7.

After Judge Seybert's decision, the only remaining claims are for monetary damages under the ADA and the Rehabilitation Act. The defendant now moves for summary judgment on both those claims.[8]

## ANALYSIS

### I.        Standard of Review

A district court may grant summary judgment only if the parties' submissions, in the form of deposition transcripts, affidavits, or other documentation, taken together, show that there is "no genuine dispute as to any material fact," and therefore the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) & (c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). To defeat a properly supported summary judgment motion, the plaintiff must put forward similar materials setting out specific facts that demonstrate that there is a genuine issue of material fact to take to a jury. *Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 373 (E.D.N.Y. 2013) *aff'd*, 578 F. App'x 34 (2d Cir. 2014).

The court is to draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). On the other hand, a mere "scintilla of evidence in support of the [non-movant's] position" is inadequate to avoid summary judgment. *Hayut v. State Univ. of New York*, 352 F.3d 733, 743 (2d Cir. 2003) (citation and internal quotation marks omitted). Summary judgment is appropriate where there is

---

[8] The defendant also moves for summary judgment on the plaintiff's claims under the IDEA and 42 U.S.C. § 1983. However, Judge Seybert already dismissed the plaintiff's IDEA claim in her September 10, 2013 order, and had adopted Judge Boyle's report recommending that the plaintiff's request to amend her complaint to add § 1983 claims be denied. Therefore, claims under the IDEA and § 1983 are not at issue in this case.

"nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (citation and internal quotation marks omitted).

## II.    The ADA and the Rehabilitation Act

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Similarly, section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . .  shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). As the standards are generally the same under either the ADA or the Rehabilitation Act, courts treat claims under the two statutes identically.  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003); *see also Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999) ("Because Section 504 of the Rehabilitation Act and the ADA impose identical requirements, we consider these claims in tandem.").

In order to demonstrate a violation of the ADA, a plaintiff must show that (1) he is a "qualified individual" with a disability; (2) that the defendant is subject to the ADA; and (3) that he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant, by reason of his disabilities. *Henrietta D.*, 331 F.3d at 272.  In addition, in order to demonstrate a violation of the Rehabilitation Act, a plaintiff must also show that the defendant received federal funding. *Id.* (internal citation omitted).

14

Here, the plaintiff claims that the school district's violations of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.*, warrants an award of damages under the the ADA and the Rehabilitation Act. (Pl. 56.1 Stmt. ¶ 4.)  Under the IDEA, a state receiving federal funding must provide a "free appropriate public education ["FAPE"] . . . to all children with disabilities residing in the State." 20 U.S.C. § 1412(a)(1)(A).  "To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ("IEP") for each child." *R.E. v. New York City Dept. of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012); *see also Honig v. Doe*, 484 U.S. 305, 311 (1988) (IEP is "the centerpiece of the [IDEA's] delivery system for disabled children").[9]

A violation of the IDEA, without more, is insufficient to support a claim of disability-based discrimination under the ADA or section 504 of the Rehabilitation Act. *French v. New York State Dept. of Educ.*, 476 Fed.Appx. 468, 472–73 (2d Cir. 2011) (internal citation omitted). This is because while the Rehabilitation Act and ADA "provide[] relief from discrimination . . . [the] IDEA provides relief from inappropriate educational placement decisions, regardless of discrimination." *BD v. DeBuono*, 130 F.Supp.2d 401, 438 (S.D.N.Y. 2000); *see also Scaggs v. New York Dept. of Educ.*, No. 06-cv-0799, 2007 WL 1456221, at *15 (E.D.N.Y. 2007) ("[b]oth the ADA and Section 504 address discrimination against disabled students, rather than incorrect or erroneous special education treatments, as in the case of IDEA."). Therefore, although a claim under the ADA or Rehabilitation Act "may be predicated on the claim that a disabled student was 'denied access to a free appropriate education,'" the plaintiff must show that the

---

[9] In her September 10, 2013 decision on the defendant's motion to dismiss the amended complaint, Judge Seybert dismissed the plaintiff's claims for money damages under the IDEA, to the extent that he intended to raise them.  Although this dismissal was without prejudice, the plaintiff has not indicated that he intends to assert claims under the IDEA.

school district acted in bad faith or with gross misjudgment in denying him that education: in other words, that the defendant engaged in intentional discrimination against the plaintiff. *C.L. v. Scarsdale Union Free School Dist.*, 744 F.3d 826, 841 (2d Cir. 2014); *see also Wenger v. Canastota Ctrl. Sch. Dist.,* 979 F.Supp. 147, 152 (N.D.N.Y. 1997), *aff'd mem.,* 208 F.3d 204 (2d Cir. 2000) ("[S]omething more than a mere violation of the IDEA is necessary in order to show a violation of Section 504 in the context of educating children with disabilities, *i.e.*, a plaintiff must demonstrate that a school district acted with bad faith or gross misjudgment."); *S.W. by J.W. v. Warren*, 528 F.Supp.2d 282, 290 (S.D.N.Y. 2007) (a plaintiff can rely on the Rehabilitation Act to claim that he was denied access to a free appropriate public education if he can show that "defendants acted with bad faith or gross misjudgment in the administration of disability services.").

Moreover, in order to recover money damages under the ADA or Rehabilitation Act, a plaintiff must show that the defendant acted with "deliberate indifference" to his rights under those statutes. *Gershanow v. Cnty. Of Rockland*, No. 11-cv-8174, 2014 WL 1099821, at *4 (S.D.N.Y. Mar. 20, 2014); *see also Loeffler v. Staten Island Univ. Hosp.,* 582 F.3d 268, 275 (2d Cir. 2009) (monetary damages under the Rehabilitation Act are "recoverable only upon a showing of an *intentional* violation.") (emphasis in original).  This does not require a showing of "personal animosity or ill will"; rather, it "may be inferred when 'a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy . . . [or] custom." *Loeffler*, 582 F.3d at 268 (internal citation omitted).

Here, the parties do not dispute that the plaintiff is disabled under the terms of the ADA and Rehabilitation Act, and that the district is covered by the terms of these statutes.  Rather, the

16

defendant argues that some of the plaintiff's claims are time-barred, and, in any event, that the plaintiff has presented no evidence that the district acted in bad faith or with deliberate indifference to his needs. (Def. Mem., at 21-22.) The record shows that not only did the district not act in bad faith or with deliberate indifference to the plaintiff's needs, it actually was responsive to and accommodated the plaintiff's mother's specific requests, as well as those of his treating psychiatrist. Accordingly, the plaintiff is not entitled to money damages.

### A.     Statute of Limitations

The plaintiff claims that while he was at Sachem, the district permitted him to leave class early because he could not suppress his Tourette's related tics. According to the plaintiff, this accommodation was an act of discrimination, because other students were not also permitted to walk out of their classrooms whenever they chose. The defendant responds that any claims that accrued prior to March 30, 2008—in other words, all claims that arise out of his time at Sachem North High School—are time-barred. (Defendant's Memorandum of Law in Reply to Plaintiff's Opposition ("Def. Reply"), ECF 88, at 8-9.)

A three-year statute of limitations applies to the plaintiff's claims under the Rehabilitation Act and ADA. *Piazza v. Florida Union Free School District*, 777 F.Supp. 2d 669, 687 (S.D.N.Y. 2011); *Scaggs v. New York Dept. of Educ.*, No. 06-cv-0799, 2007 WL 1456221, at *9 (E.D.N.Y. 2007).[10] Under federal law, "a cause of action accrues 'when the plaintiff knows or has reason to know of the injury that is the basis of the action." *BD v. DeBuono*, 130 F.Supp.2d 401, 424 (S.D.N.Y. 2000) (quoting *Hili v. Sciarotta*, 955 F.Supp. 177, 181 (E.D.N.Y.

---

[10] In his decision on the plaintiff's mother's IDEA claims, the IHO found that any claims as to the 2007-2008 school year were time-barred under the two-year statute of limitations applicable to the IDEA, and that he therefore could only consider claims arising out of the 2008-2009 school year. Here, however, the Court considers whether the plaintiff's claims are barred by the statute of limitations applicable to the ADA and Rehabilitation Act.

1997)).  Since the plaintiff's mother filed her initial complaint on March 30, 2011, it would

appear that any claims that accrued before March 30, 2008 are time-barred.

> However, as Judge Seybert explained in her September 10, 2013 order on the defendant's

motion to dismiss, the plaintiff's mother was required to exhaust her administrative remedies

prior to bringing her ADA and Rehabilitation Act claims in court.  *Rekowicz v. Sachem Central*

*School Dist.*, 2013 WL 4852305, at *6 (E.D.N.Y. Sept. 10, 2013) (citing *Scaggs*, 2007 WL

1456221, at *4); *see also Polera v. Board of Educ. of Newburgh Enlarged City School Dist.*, 288

F.3d 478, 488 (2d Cir. 2002) ("The IDEA is intended to remedy precisely the sort of claim made

by [the plaintiff]:  that a school district failed to provide her with appropriate educational

services.  The fact that [the plaintiff] seeks damages, in addition to relief that is available under

the IDEA, does not enable her to sidestep the exhaustion requirements of the IDEA.").  Under

similar circumstances, the Second Circuit has found that the statute of limitations was equitably

tolled while the plaintiff pursued required administrative remedies.  For example, in *Gonzalez v.*

*Hasty*, 651 F.3d 318 (2d Cir. 2011), the Second Circuit equitably tolled the statute of limitations

during the time a prisoner was exhausting his administrative remedies pursuant to the Prisoner

Litigation Reform Act.  *Id.*, at 323-24.  The Court explained that "[t]he 'catch-22' . . . is self-

evident: the prisoner who files suit . . . prior to exhausting administrative remedies risks

dismissal . . . whereas the prisoner who waits to exhaust his administrative remedies risks

dismissal based upon untimeliness."  *Id.*, at 323 (quoting *Johnson v. Rivera,* 272 F.3d 519, 522

(7th Cir. 2001)).

> This reasoning applies with equal force to the plaintiff's claims.  Although the

administrative process actually took just over a year, it is entirely possible that the administrative

process could have taken longer than that.  *See Gonzalez*, 651 F.3d at 323 (noting that although

the grievance process provided that claims would be resolved within a certain time frame, due to provisions allowing for extensions, "it is certainly possible that a full three years could pass while an inmate exhausts remedies."). Therefore, the Court finds that the statute of limitations was equitably tolled while the plaintiff was pursuing his IDEA claims related to the 2007-2008 and 2008-2009 school years under the administrative process. As a result, the plaintiff's claims related to his 2007-2008 and 2008-2009 school years are not time-barred. To the extent, however, that the plaintiff is raising claims based on his 2005-2006 and 2006-2007 school years, those claims are time-barred.[11]

### B.    Leaving Class Early and Truncated School Day

First, the plaintiff claims that the district discriminated against him by allowing him to leave class whenever he chose, and by shortening his school day.[12] However, the record evidence shows that these concessions were neither discriminatory nor evidence of indifference to the plaintiff. On the contrary, the school was making every effort to accommodate the plaintiff's needs; in most instances, these accommodations were a direct response to requests from the plaintiff's mother and psychiatrist.

The record shows that medical professionals specifically noted the plaintiff's difficulties with suppressing his tics in the classroom. In an April, 2007 report, the school psychologist

---

[11] Further, the plaintiff's administrative claims did not relate to these school years, and he therefore has not exhausted his remedies with respect to them. *See Scaggs*, 2007 WL 1456221, at *4 ("[T]he IDEA statute requires plaintiffs with any claims related to the education of disabled children, whether brought under IDEA or another statute (*i.e.*, the ADA), to exhaust administrative remedies under IDEA prior to initiating a federal lawsuit.") (citing 20 U.S.C. § 1415(l)).

[12] The parties do not dispute that this took place during his ninth through eleventh grade years. As only allegations relating to his ninth and tenth grade years are time-barred, the Court will consider these claims.

noted that the plaintiff's urge to suppress his tics could be affecting his academic performance, and asked his CSE team to consider what support he may need. Then, in the fall of 2007, the plaintiff's psychiatrist submitted three different letters to the district suggesting that the plaintiff was struggling to suppress his tics, and that this was affecting his academic performance. In each letter, she requested a truncated school day for the plaintiff; the district accommodated each of these requests. The plaintiff's 2007 IEP provided that the plaintiff required an abbreviated school day and an opportunity to leave the classroom as necessary.

Further, the plaintiff himself testified that suppressing his Tourette's-related tics caused him anxiety, and that he needed to leave the room and get help. (Def. Ex. G, at 35-36.) He also admitted that when he left the classroom, school personnel helped him by encouraging him to conduct visualizations and breathe, and to try to return to his class. (Def. Ex. FF, at 938-39.) Although these efforts were not necessarily always successful—the plaintiff testified that he was generally unable to go back to class, and often sat with the security guard until his mother picked him up—there is no evidence that this was a consequence of bad faith, gross misjudgment, or deliberate indifference by the school.

Finally, at almost every point in the plaintiff's education, the district worked with the plaintiff's mother and treating physicians to identify alternate solutions to accommodate the plaintiff's difficulties in suppressing his Tourette's-related tics. For example, when the plaintiff's educational advocate and mother both suggested that EAC would be an appropriate placement for him, the district convened a CSE subcommittee to discuss the issue, obtained more information about the placement, and then reconvened a full committee meeting in order to authorize the placement. In sum, the plaintiff has not pointed to any evidence in the record that suggests that the district was discriminating against him by doing precisely what his advocates

requested; rather, the record shows that the district worked with the plaintiff's parents and treating doctors in an attempt to accommodate his disability, and that they continued to consider alternate accommodations that the plaintiff's advocates suggested.

### C.   Grade "Fabrication" and "Bolstering"

The plaintiff also claims that his teachers at both Sachem and EAC fabricated or bolstered his grades to accelerate his progress through high school. He alleges that this was a form of discrimination against him, as other non-disabled students were required to master the course material. These grade-bolstering claims arise out of two different sets of facts. First, the plaintiff asserts that his grades while at Sachem North must have been fabricated because he was "never" in class and was not required to make up the lost class time, and that he therefore could not have met New York State's mandated "seat time" for all his classes. (Pl. Mem., at 8; Pl. 56.1 Stmt. ¶¶ 141, 157.)

As an initial matter, this claim is not borne out the by the record, which does not show that the plaintiff was "never" present in class; rather, it shows that he was leaving class 15-20 minutes early several times a week. (Pl. Ex H.) It is true that New York regulations—which the plaintiff references, but does not cite—require that a student earn a certain number of "units of credit" in specified subjects in order to receive a diploma. NYSED Part 100.5(a). These units of credit, however, are not defined only by the amount of time a plaintiff spends in the classroom, or a "unit of study." Instead, a unit of credit is earned by either "the mastery of the learning outcomes set forth in a New York State-developed or locally developed syllabus . . . after a student has had the opportunity to complete a unit of study in the given subject matter area" *or* "a passing score of at least 85 percent or its equivalent on a department-approved examination in a given high school subject without the completion of a unit of study." NYSED 100.1,

Definitions. [13] In other words, that the plaintiff missed class time while he attended Sachem

North but still passed his classes and eventually earned a high school diploma does not

automatically mean that his grades must have been fabricated or bolstered.[14] He could also have

earned units of credit by earning passing grades in his classes.

As the second basis for his grade-bolstering claim, the plaintiff alleges that certain

teachers at both Sachem and EAC manipulated his test scores so that he could pass his classes.

(Pl. Mem., at 8; Pl. 56.1 Stmt. ¶¶ 150-152.) He claims that his history teacher at Sachem graded

his tests based only on the questions that he answered, rather than the whole test. (Pl. 56.1 ¶ 153;

Pl. Ex. A, at 107-109; Pl. Ex. B, at 102-103.)[15] But there is no evidence, as the plaintiff

contends, that his grades were "fabricated." As Sachem's assistant coordinator for student

---

[13] *See also* New York City Department of Education, High School Academic Policy Guide
(September 2016), at 9, available at
http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=6&ved=0ahUKEwjLzofc
w4rRAhWJllQKHYvVBSUQFgg8MAU&url=http%3A%2F%2Fschools.nyc.gov%2FNR%2Frd
onlyres%2F27BF8558-B895-407A-8F3F-
78B1B69F030A%2F0%2FAcpolicyHighSchoolAcademicPolicyReferenceGuide.pdf&usg=AFQ
jCNGB22iMHsook1a3q6FcORthjQv1yg&sig2=oOXJdiUS9eaWDwdmeH3mgg&bvm=bv.1420
59868,d.cGw ("When students miss class time, they must be provided opportunities to make up
the classwork, assignments, assessments, and other learning experiences; students are not
required to make up the exact amount of instructional time due to absence. Students who master
the course content and satisfactorily meet expectations outlined in the syllabus for a course must
receive credit for the course; they may not be denied credit based on lack of 'seat time' alone.")
(last visited January 13, 2017).

[14] The plaintiff also complains that he was not required to make up the class time that he missed
while at Sachem. While testimony does indicate that he did not make up this missed class time,
the plaintiff does not point to any evidence that this was a result of discrimination against him, or
gross misjudgment by, the school district.

[15] It is not clear from the record in which school year this is supposed to have taken place. While
at some points, the plaintiff claims that this took place in his tenth grade year (Pl. Ex. B, at 102-
103), other witnesses testified that it took place in his eleventh grade year. (Pl. Ex. C., at 85.)
Although claims arising out of his ninth and tenth grade years are time-barred, due to the lack of
clarity in the record about when the alleged "grade bolstering" took place, the Court will
consider this claim out of an abundance of caution.

services testified, grading a student only on the questions that he answered was a type of accommodation that special education teachers offered to students with special needs. (*See* Def. Ex. I, at 85-89). Moreover, the plaintiff points only to one teacher that supposedly manipulated his grades; he does not accuse any other teacher at Sachem of grade manipulation. In sum, the plaintiff has pointed to no evidence from which a jury could conclude that this accommodation, assuming it happened, constituted an act of intentional discrimination against the plaintiff by the district.

The plaintiff also complains about the conduct of certain teachers at EAC: that they "guided" him through tests, which he asserts was discriminatory. (Pl. 56.1 ¶ 189, Pl. Ex. A, at 115.) He says that his English teacher, Mr. Papacino, helped him by reading him paragraphs and "really break[ing] it down;" on the other hand, he also testified that Mr. Papacino did not hinder his education, and did nothing improper with respect to his grades. (Pl. Ex. B, at 129-30.) In fact, he testified that he thought that Mr. Papacino was trying to help him, and that he was actually more comfortable with the teaching environment at EAC than at Sachem. (*Id.*, at 129-30.) The plaintiff also asserts that his social studies teacher for all three years at EAC, Ms. Orlando, guided him to the right answers on tests. (*Id.*, at 130-132.) Significantly, however, Ms. Orlando stepped in when he showed signs of anxiety or was struggling on a test. (*Id.*, at 133-34.) The plaintiff admitted that he did not know if Ms. Orlando was trying to help him through his symptoms of anxiety or was deliberately trying to give him the right answer. (*Id.*, at 134.)

Finally, there is no dispute that the plaintiff passed the New York Regents exam, a standardized test, in June of 2009. That he was able to pass this test suggests that the plaintiff had mastered class material to the extent required by New York state, and that he did not

graduate from high school only because his teachers inflated his grades.[16]   In short, there is no

evidence that the plaintiff's teachers at Sachem or EAC acted in bad faith, or with gross

misjudgment or deliberate indifference to his needs.  Indeed, this claim seems to fall squarely

within the "no good deed goes unpunished" category; the only thing the record shows is that his

teachers were trying to help him and to accommodate his disability, not that they were trying to

"falsely accelerate his progress to push him through to graduation."  (Pl. Mem. of Law, at 7.)

The plaintiff is not entitled to money damages.

### D.    Home Instruction

The plaintiff's claims about the circumstances of his home instruction and his time at

EAC are also refuted by the record.  Moreover, in making these claims, he omits that both

placements were responsive to specific requests from his mother and psychiatrist.  As for his

claim that he received no home instruction during the three months before he started at EAC,

those circumstances appear to be solely attributable to the plaintiff's parents, who did not return

the phone calls of instructors seeking to schedule instruction.[17]

Equally baseless are the plaintiff's complaints about his EAC placement, which he

characterizes as "evidence of the District's gross negligence and reckless indifference" towards

his education.  (Pl. Mem., at 9-10.)  Apparently, his mother and psychiatrist did not agree,

because they specifically requested that he be placed at EAC.[18]  His claim that the district did not

---

[16] Further, when the plaintiff's mother asked that he be granted an additional year to complete his studies because she felt that he was not yet prepared to graduate, the district granted that request.

[17] The plaintiff does not address or submit any evidence to rebut this claim, and instead merely re-iterates that he "did not receive home instruction in the interim and was instead left with no instruction for almost three (3) months."  (Pl. 56.1 ¶ 161.)

[18] The plaintiff's claim that the district somehow abdicated its responsibility to the plaintiff by accepting his mother's suggestion that he be placed at EAC is without merit.  Minutes from the plaintiff's 2008 CSE meeting do not show that the district merely acquiesced to the requests of

first consider less restrictive placement options before placing him at EAC, (Pl. Mem., at 9), is refuted by the record, which shows that the CSE did consider other less restrictive placement options for him, such as special classrooms and private schools, but found that there were none that could meet his needs. (Pl. Ex. J, "Least Restrictive Environment Statement.") Indeed, as the minutes from the plaintiff's 2008 IEP meeting demonstrate, the school district initially took the position that the plaintiff should stay in a 15:1 classroom, a less restrictive setting; it was the plaintiff's advocates who urged the EAC placement.

There is no doubt that the plaintiff's educational journey was a difficult one, both for him and his parents. However, his claims that the school district exercised gross misjudgment and subjected him to intentional discrimination are not supported by the record, which shows a school district doing its best to work with the plaintiff and his representatives. Under these circumstances, no reasonable factfinder could find for the plaintiff. *See C.L. v. Scarsdale Union Free School Dist.*, 744 F.3d 826, 841 (2d Cir. 2014) (affirming dismissal of Rehabilitation Act claims where the parents had not raised any concrete evidence to support an assertion that the school district had "deliberately" limited accommodations provided to their son).

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment (ECF 80) is granted in its entirety and the plaintiff's claims are dismissed. The Clerk of the Court is respectfully directed to close this case.

---

the plaintiff's advocates and treating psychiatrist, but that the meeting participants discussed the plaintiff's needs and which placement options would be most suitable for him. Indeed, at the end of the meeting, the school district representative indicated that she would need to obtain further information about EAC, and that the CSE would reconvene at a later date.

**SO ORDERED.**

s/Ann M. Donnelly

_____

Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
      January 19, 2017